# EXHIBIT A

Case 1:21-cv-04809-MKB-PK   Document 1-1   Filed 08/26/21   Page 2 of 23 PageID #: 5

**SUPREME COURT OF THE STATE OF NEW YORK**
COUNTY OF KINGS

-----------------------------------------------------------------------X

TARA SHAFA,

                              Plaintiff,

     - against –

CITY OF NEW YORK, JOHN AND JANE DOES #1-50
                              Defendants.

-----------------------------------------------------------------------X

**SUMMONS**

Plaintiff designates Kings
County as the place of trial.

The basis of venue is:
The county in which the action
arose per CPLR 504(3)

The cause of action arose in
Kings County and is against
the City of New York

TO THE ABOVE NAMED DEFENDANTS:

     **YOU ARE HEREBY SUMMONED** to answer the complaint in this action, and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance on the Plaintiff's attorney(s) within twenty days after the service of this summons, exclusive of the day of service, where service is made by delivery upon you personally within the state, or, within 30 days after completion of service where service is made in any other manner.
     **IN CASE OF YOUR FAILURE TO APPEAR OR ANSWER**, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: New York, NY
        August 13, 2021

DEFENDANTS' ADDRESS:

THE CITY OF NEW YORK
CORPORATION COUNSEL
100 Church St.
New York, NY 10038

PLAINTIFF'S ATTORNEY:

_____
Masai I. Lord, Esq.
Attorney for Plaintiff
14 Wall St, Ste 1603
New York, NY 10005

Case 1:21-cv-04809-MKB-PK   Document 1-1   Filed 08/26/21   Page 3 of 23 PageID #: 6

**SUPREME COURT OF THE STATE OF NEW YORK**
COUNTY OF KINGS

-----------------------------------------------------------------------X

TARA SHAFA,

        Plaintiff,

                  <u>**COMPLAINT**</u>

  - against –

CITY OF NEW YORK, JOHN AND JANE DOES #1
-50

        Defendants.

-----------------------------------------------------------------------X

    Plaintiff, TARA SHAFA, by her attorneys. LORD LAW GROUP PLLC and AKEEB

DAMI ANIMASHAUN, alleges upon knowledge as to herself and her own actions, and upon

information and belief as to all other matters, as follows:

### PRELIMINARY STATEMENT

  1.  In the aftermath of the police killings of George Floyd and Breonna Taylor,

thousands of New Yorkers participated in daily protests for several months against racist police

violence and brutality. Consistent with its longstanding pattern and practice, the New York Police

Department ("NYPD") responded to the protests with violence: Officers repeatedly and without

cause or justification brutalized (with batons, fist strikes, pepper spray, and other physical force),

detained, and arrested hundreds of protesters, medical and legal workers, and bystanders at

protests. The NYPD's sole purpose was to suppress and terrorize protesters.

  2.  Tara Shafa was one of many New Yorkers who was violently attacked and

unlawfully arrested by the NYPD. On May 29, 2020, while Ms. Shafa was at a protest at Barclays

Center in Brooklyn, a NYPD officer charged at her, tackled her to the ground, causing damage to

her knee, and arrested her without cause. NYPD officers then detained Ms. Shafa for several hours,

first at the Barclays center then at a local precinct. She was released after hours of detention without

charge. No officer told her why she was arrested or detained. As a result of this brutal attack and

arrest, Ms. Shafa suffered physical and emotional injuries, including damage to her knee. She seeks

monetary damages for the violation of her rights.

## JURISDICTION AND VENUE

3.      The Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§

1331 and 1343(a), and over to Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

4.      Venue lies in the Eastern District of New York under 28 U.S.C.§ 1391(b)(2)

because a substantial part of the events giving rise to Plaintiff's claim occurred in the District.

## PARTIES

5.      Tara Shafa is a 25-year-old woman. She is—and, at all times discussed herein,

was—a resident of Brooklyn, New York.

6.      Defendant City of New York is a municipal entity created and authorized under the

laws of the State of New York. Defendant City of New York can be sued in its own name.

Defendant City of New York is authorized by law to maintain a police department—the NYPD—

which acts as its agent in the area of law enforcement and for which it is ultimately responsible.

Defendant City of New York was at all times discussed herein the public employer of Defendants

NYPD Officers John and Jane Does #1-50.

7.      Defendants NYPD Officers John and Jane Does #1-50 are uniformed members of

the NYPD whose identities are unknown at this time and who are assigned to various NYPD

precincts throughout Brooklyn. Defendants John and Jane Does were at all times relevant and

discussed herein acting under color of law; in the course and scope of their duties and functions as

officers, agents, servants and employees of Defendant City of New York; and was acting for, and

on behalf of, and with the power and authority vested in them by Defendant City of New York and

the NYPD. They are sued in their individual capacities.

## JURY DEMAND

8.    Plaintiff Tara Shafa demands a jury trial.

## STATEMENT OF FACTS

### I.    NYPD Officers Battered and Unlawfully Arrested and Detained Ms. Shafa

9.    Tara Shafa is a 24-year-old film-production assistant. She is 5'3 and weighs 120 pounds.

10.    On May 29, 2020, Ms. Shafa attended a protest outside of the Barclays Center in Brooklyn.

11.    At around 6:00 or 7:00 p.m., Ms. Shafa saw a NYPD officer push a protester to the ground and immediately went to the aid of the protester.

12.    As Ms. Shafa approached the woman, she saw a gold watch on the ground.

13.    As she bent down to pick up the watch—within a split second—she heard Defendant NYPD Officer John Doe #1 ("Defendant John Doe #1")—a NYPD commanding officer who was over 6 feet tall and weighed over 200 pounds— yell "Give me back my fucking watch!"

14.    Defendant John Doe #1 raced towards Ms. Shafa, pushed her into other protesters, and eventually slammed her to the ground.

15.    The impact caused Ms. Shafa's head to forcefully hit the ground.

16.    Defendant John Doe #1 then dug his knee into Ms. Shafa's back and handcuffed her.

17.    Defendant John Doe #1 did not tell Ms. Shafa why she was being arrested and did not advise her of her rights.

18.    No NYPD officer, including Defendant John Doe #1, gave a dispersal order before Defendant John Doe #1 attacked and arrested Ms. Shafa.

Case 1:21-cv-04809-MKB-PK   Document 1-1   Filed 08/26/21   Page 6 of 23 PageID #: 9

19.     Ms. Shafa was not violent and posed no threat of violence before, during, or after she was attacked and arrested by Defendant John Doe #1.

20.     After handcuffing and arresting Ms. Safa, Defendant John Doe #1 used Ms. Shafa's backpack to pull her up from the ground and took her into the Barclays Center, where she was detained for about two hours, while she remained handcuffed

21.     After Ms. Shafa was detained in the Barclays Center, Defendant NYPD Officer John Doe #2 and Defendant NYPD Officer John Doe #3 (Defendants John Does #2 and #3) walked Ms. Shafa to the 78th Precinct, while she remained handcuffed and had her booked into the Precinct.

22.     While Ms. Shafa was being booked into the Precinct, NYPD officers patted her down, searched her person and backpack, and made her take off her shoes. The officers, however, recovered nothing illegal.

23.     NYPD officers then placed Ms. Shafa in a holding cell for several more hours.

24.     During the early morning hours of May 30, 2020, Ms. Shafa was released from the 78th Precinct without a desk appearance ticket or summons to appear in court.

25.     An NYPD officer at the Precinct told Ms. Shafa that she did not know why she was arrested and that her arrest would be voided.

26.     Upon information and belief, no NYPD officer, including Defendants John Does #1, #2, and #3, created a police report stating why Ms. Shafa was arrested.

27.     Ms. Shafa was never told by any NYPD officer why she was arrested or detained—neither at the time of the arrest nor during her subsequent detention.

28.     NYPD officers did not offer or provide Ms. Shafa with food, water, or medical care during the time she was detained in their custody.

Case 1:21-cv-04809-MKB-PK Document 1-1 Filed 08/26/21 Page 7 of 23 PageID #: 10

29.     During her violent arrest, Ms. Shafa suffered a knee sprain, as well as head injuries, including bruising, dizziness, and memory loss.

30.     In addition to her physical injuries, Ms. Shafa was also traumatized by the violent arrest and detention and continues to suffer emotional distress: she endured a week of sleepless nights and is still afraid to interact with police officers.

## II.  NYPD Systematically Used Excessive Force and Unlawful Detentions and Arrests to Suppress the Widespread Protests that Occurred After the Police Killings of George Floyd and Breonna Taylor

1.      Ms. Shafa was just one of many protesters at Barclays Center who was violently attacked and arrested on May 29. Two Black state legislators—Senator Zellnor Myrie and Assemblywoman Diana Richardson—were also attacked at the protest. They explained to reporters how NYPD officers brutalized and arrested many other protesters that evening: "officers with bicycles began surrounding them and the group of protesters they were demonstrating alongside. The officers began pressing the wheels of their bikes into their bodies and then proceeded to pepper-spray them."[1] Videos also show NYPD officers violently throwing protesters to the ground, punching and striking protesters with their batons, and indiscriminately pepper-spraying protesters.[2]

2.      NYPD's conduct during the Barclays Center protest was not unique. NYPD systematically used excessive force and unlawful detentions and arrests to suppress large-scale protests that occurred in the wake of the police killings of George Floyd and Breonna Taylor. The

---

[1] Amanda Luz Henning Santiago, Even Black Lawmakers Get Pepper-Sprayed, CITY & STATE N.Y. (June 3, 2020), https://www.cityandstateny.com/articles/politics/news-politics/even-black-lawmakers-get-pepper-sprayed.html.

[2] Matt Troutman, NYPD, Protesters Clash at Rally Over George Floyd Killing, PATCH (May 30, 2020), https://patch.com/new-york/prospectheights/brooklyn-joins-protests-over-george-floyd-killing.

Case 1:21-cv-04809-MKB-PK Document 1-1 Filed 08/26/21 Page 8 of 23 PageID #: 11

protests began on May 28, 2020, and continued on a near-daily basis in every borough of New York City for several months thereafter (the "Protests").

3. The vast majority of the Protests were peaceful: NYPD Commissioner Dermot F. Shea acknowledged that New Yorkers who attended the protests "overwhelmingly [] are good people coming out to voice their opinion." NYPD Chief Terence A. Monahan also admitted in a public statement that "the vast majority of people are out there to express their views."

4. In response to these largely peaceful Protests, NYPD officers repeatedly and without justification used batons, fist strikes, pepper spray, and other physical force, all of which constitute excessive force, against people peacefully protesting police brutality, continuing its custom, policy, or usage of suppressing peaceful protests with excessive force.

5. The NYPD also effected mass arrests and detained protesters without cause or justification, continuing its custom, policy, or usage of suppressing peaceful protests with unlawful detentions and arrests.

6. In July 2020, the New York State Attorney General (the "AG") issued a preliminary report on the NYPD's response to the Protests ("AG Report").[3]

7. The AG Report found that most complaints received by the AG were allegations of excessive force— against protesters, the press, legal observers, elected officials, and essential workers—and unlawful arrests.

8. The AG received more than 100 phone calls and over 1,200 written complaints about unlawful NYPD protest-related conduct during the first two months of the Protests.[4]

---

[3] New York State Office of the Attorney General, *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd* (July 2020), https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf.

[4] *Id.* at 5.

Case 1:21-cv-04809-MKB-PK   Document 1-1   Filed 08/26/21   Page 9 of 23 PageID #: 12

9.      "Most of the complaints [the AG] received were about allegations of NYPD officers using excessive force against protesters, including use of batons and indiscriminate use of pepper spray, brandishing firearms at protesters, and pushing vehicles or bikes into protesters."[5]

10.      "The []AG received complaints and heard extensive testimony at its public hearing about a tactic NYPD used whereby officers surrounded and blocked protesters, preventing them from leaving an area without making direct contact with police officers. According to witnesses, this practice often led to violent clashes between NYPD and protesters."[6]

11.      "The []AG received a significant number of complaints about troubling arrest-related practices, including, among others, using extremely tight zip ties to restrict hands, transporting protesters long distances to arrest processing centers, holding protesters for a significant amount of time after arrest, misgendering detainees, and holding protesters in cramped cells under unsafe conditions in light of the ongoing COVID-19 pandemic."[7]

12.      The NYC Department of Investigation made similar findings in a December 2020 report ("DOI Report").[8]

13.      The DOI Report concluded, inter alia, that "the force required to carry out a mass arrest was disproportionate to the identified threat, placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity."[9]

---

[5] Id.

[6] Id.

[7] Id.

[8] New York City Department of Investigations, *Investigation into NYPD Response to the George Floyd Protests* (Dec. 2020), https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf.

[9] Id. at 56.

Case 1:21-cv-04809-MKB-PK Document 1-1 Filed 08/26/21 Page 10 of 23 PageID #: 13

14. The Report also found that between May 28 and June 20, the Civilian Complaint Review Board ("CCRB") received 1,646 protest-related complaint: "Force allegations comprised the largest number of allegations (1,052 in total)."[10]

15. In September of 2020, Human Rights Watch issued a detailed analysis of a June 4, 2020 protest in the Mott Haven neighborhood of the Bronx ("HRW Report")[11]. The report described the preplanned and coordinated disruption of the march by the NYPD, including by Chief Monahan who was at the protest.

16. The HRW Report describes the systematic "kettling" of protesters before the 8:00 p.m. curfew and NYPD's use of excessive force and mass arrest of protesters, as well as medical workers and legal observers, who were classified as essential workers exempt from the curfew.

17. Numerous lawsuits, including one by the AG, have been filed challenging NYPD's use of excessive force and unlawful detentions and arrests during the Protests. *See, e.g.*, *People of the State of New York v. City of New York, et al.*, 21-cv-0322, Doc. 51 (S.D.N.Y.) (First Amended Complaint).

18. The AG's Complaint details NYPD's widespread use of excessive force against peaceful protesters during the Protests. For example:

   a. At a May 28 protest at Union Square, NYPD Officers repeatedly rammed their bicycles into peaceful protesters. *Id.* ¶¶ 128-132.

___

[10] *Id.*

[11] Human Rights Watch, *"Kettling" Protesters In The Bronx: Systemic Police Brutality And Its Costs In The United States* (Sept. 2020), https://www.hrw.org/report/2020/09/30/kettling-protesters-bronx/systemic-police-brutality-and-its-costs-united-states.

Case 1:21-cv-04809-MKB-PK   Document 1-1   Filed 08/26/21   Page 11 of 23 PageID #: 14

b.   At a May 29 protest in Clinton Hill, NYPD officers, without warning or provocation, repeatedly charged into a crowd of protesters and hit them with batons, causing at least one protester to bleed profusely and sustain a concussion. *Id.* ¶¶ 133-138.

c.   On the same night, at a different protest in Bedford-Stuyvesant, Brooklyn, NYPD officers charged into a group of peaceful protesters gathered on a sidewalk, causing some to fall to the ground. As one protester laid on the ground, a NYPD officer swung a baton overhead and hit the protester, causing a two-inch laceration on her forehead that bled profusely. *Id.* ¶¶ 141-146.

d.   At a May 31 protest, on or around Broadway and East 11th Street in Manhattan, NYPD Officers in riot gear blocked the path of protesters and ordered them to disperse. Officers then charged into the crowd of protesters, striking them with their shields and batons. *Id.* ¶¶ 155-160.

e.   At a June 4 protest in the Mott Haven Neighborhood of the Bronx:

> NYPD Officers, including at least one supervisor, sat on top of a parked car. Beneath them stood a large group of protesters who were barricaded in by NYPD Officers and prevented from exiting the area. The NYPD Officers perched on the car swung their batons at the heads of protesters standing below and dispersed pepper spray into the crowd. *Id.* ¶ 169.
>
> . …
>
> During the Protests, NYPD Officers engaged in a pattern or practice of using pepper spray indiscriminately against protesters who were not posing a threat to any individual or actively resisting arrest. *Id.* ¶ 171.

19.   The AG's Complaint details numerous other instances of NYPD officers using excessive force during the Protests, including indiscriminate use of pepper spray; striking protesters with batons and other objects; and shoving, ramming, and charging at protesters.

Case 1:21-cv-04809-MKB-PK   Document 1-1   Filed 08/26/21   Page 12 of 23 PageID #: 15

20.     The AG's Complaint also details NYPD's widespread use of unlawful arrests during the Protests:

a.     Throughout the Protests, NYPD officers wrongfully arrested individuals exempt from the Curfew Orders, including legal observers, medics, jail support providers and other essential workers. *Id.* ¶¶ 262-323.

b.     At a June 3 protest in Midtown Manhattan, NYPD officers surrounded a group of peaceful protesters around East 54th and Third Avenue, and without warning charged into protesters from all sides and used excessive force while making unlawful arrests. *Id.* ¶¶ 347-354.

c.     On June 4, in South Williamsburg, NYPD officers blocked the path of about 400 marching protesters. The Officers did not give protesters warning or a dispersal order before charging into the crowd, indiscriminately throwing protesters to the ground, beating them with batons, and arresting them. *Id.* ¶¶ 355-365.

d.     At a June 4 protest in Mott Haven, NYPD Officers surrounded protesters such that they were not able to leave, brutalized, and unlawfully arrested over 250 individuals. *Id.* at 366-387.

21.     The DOI Report, AG Report, HRW Report, and lawsuits filed following the Protests document the NYPD's persisting policy and practice of violently suppressing peaceful protest with excessive force and unlawful arrests.

**III.     The NYPD Has a History of Responding to Peaceful Protests with Excessive Force and Unlawful Arrests. Defendant City of New York has Failed to Train, Supervise, Discipline, and Otherwise Take Measures to Stop this Unlawful Conduct from Occurring**

22.     NYPD's response to the Protests was not unique. For at least the last two decades, the NYPD has engaged in the same unlawful policies and practice of using excessive force and

Case 1:21-cv-04809-MKB-PK   Document 1-1   Filed 08/26/21   Page 13 of 23 PageID #: 16

unlawful arrests to suppress large-scale protests. This misconduct is widely documented in prior lawsuits, complaints, and reports.

23.     Following a 2003 anti-war protest, an investigation by the New York Civil Liberties Union (NYCLU) documented 198 accounts of excessive force by NYPD Officers, including the use of horses and batons to disperse crowds as well as indiscriminate pepper spraying. This investigation also documented the use of crowd control tactics such as physically preventing demonstrators from reaching their rally location, herding protesters into pens fashioned from metal barricades, and conducting mass arrests.[12]

24.     NYCLU documented similar unconstitutional practices at protests of the 2004 Republican National Convention ("RNC"). NYCLU received over 200 complaints from witnesses at the RNC protests and published a report finding that the NYPD "severely undermined" protesters' rights through "mass arrests of hundreds of peaceful demonstrators and bystanders" and "the pervasive surveillance" of lawful demonstrators.[13]

25.     The CCRB, an independent NYPD oversight agency, conducted its own investigation and made similar findings regarding the RNC protest in a published report. CCRB found that then-Deputy Chief Monahan and another deputy chief failed to make their orders to disperse sufficiently audible, understandable, or with enough time to allow protesters to leave before effecting arrests, resulting in the mass arrest of nearly 250 protesters.

26.     Following large-scale demonstrations in downtown Manhattan in 2011, known as the "Occupy Wall Street" protests, the Protest and Assembly Rights Project issued a 2012 report

---

[12]     N.Y. Civil Liberties Union, *Arresting Protest* (2003), https://www.nyclu.org/sites/default/files/nyclu_arresting_protest.pdf.

[13]     N.Y. Civil Liberties Union, *Rights and Wrongs at the RNC* (2005), https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf.

detailing 130 complaints of excessive or unnecessary force against protesters, bystanders, lawyers, legal observers, and journalists. These claims included over a dozen instances where officers interfered with independent monitoring by journalists and legal observers by threatening to or in fact arresting them, and the repeated use of kettling against peaceful protesters, which "inflamed tensions," "caused confusion and panic," and "chilled ongoing and future protest activity."[14]

27. In October 2015, the NYPD Office of the Inspector General ("NYPD-OIG") issued a report assessing the NYPD's use of force. It found that (1) the NYPD's "use-of-force policy was vague and imprecise, providing little guidance to individual officers on what actions constitute force and providing insufficient instruction on de-escalation"; (2) the "NYPD's training programs did not adequately focus on de-escalation"; and (3) the "NYPD frequently failed to impose discipline even when provided with evidence of excessive force."

28. Despite repeated notice about the NYPD's shortcomings in lawfully policing protests and the NYPD-OIG's own report on training deficiencies in connection with the use of force, the NYPD's recent conduct demonstrates that the City failed to correct these practices and adequately train its officers on constitutional policing during protests.

29. This was confirmed by a December 2020 DOI Report[15], which found that prior to the Protests, the NYPD lacked standardized, agency-wide, in-service training related to policing protests.

30. The DOI Report specifically found that the NYPD lacked a sufficiently tailored strategy to respond to protests, used force and tactics of crowd control that led to excessive force

---

[14] Protest & Assembly Rights Project, *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street* (2012), https://cdn.theatlantic.com/static/mt/assets/politics/Suppressing%20Protest.pdf.

[15] *See supra* n.8.

and "heightened tensions," made decisions based on intelligence that lacked "context or proportionality," and deployed officers who lacked sufficient training in responding to protests.[16]

31.     Similarly, a December 2020 report by the NYC Corporation Counsel uncovered that the NYPD failed to conduct "any protest-related after action-review" between (at earliest) the 2004 RNC protests and the Protests.[17]

32.     After release of the NYC-DOI and Corporate Counsel reports, the City admitted that it failed to train NYPD officers in policing protests and to otherwise correct and prevent their misconduct.

33.     In a December 18, 2020 video statement posted on social media, New York City Mayor Bill de Blasio acknowledged that he "agree[d] with [the NYC-DOI's] analysis" and with its recommendations. He confirmed that New York City Police Commissioner Dermot Shea also agreed. He further admitted that "there were things that happened that were not about whether someone made the individual mistake, there were choices made, strategic choices, that weren't good choices it turns out; that end up causing problems. And we have to come to grips with that. We have to train our police force differently."

34.     NYPD leadership also admitted that it failed to prepare NYPD Officers for the Protests. Now-retired NYPD Chief of Department Terence Monahan admitted after the Protests that "[a] lot of cops had not received disorder trainings since they first came on the job."

35.     This failure predictably led to constitutional violations. As NYPD Chief of Patrol Juanita Holmes stated in October 2020 about the Protests: "[i]f [the officers] [saw] something that they perceived to be a violation of the law, they arrested that person, not realizing that protests are

---

[16] *Id.* at 36.

[17] New York City Law Department, Corporation Counsel Report (Dec. 2020), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf.

allowed—that peaceful protests are allowed." She further admitted that "we had officers that did

things that never should have been done; that's not in alignment with what we stand for as agency."

36.     Upon information and belief, the City has not disciplined the vast majority NYPD

Officers who engaged in misconduct during the Protests.

## CLAIMS FOR RELIEF
### Claim I: Excessive Force
*Against Defendants City of New York and John Doe #1*

*Fourth and Fourteenth Amendment, 42 U.S.C. § 198*

37.      Plaintiff realleges the preceding paragraphs as if set forth here.

38.     Defendant John Doe #1 acting under color of state law, used objective unreasonable

force against Plaintiff Shafa, proximately causing injury.

39.     NYPD's practice and custom of using unreasonable force against protesters has and

continues to be so persistent and widespread that it practically has the force of law, constituting a

policy of Defendant City of New York. Moreover, despite being aware of the NYPD's repeated

use of excessive and unlawful force at protests, Defendant City of New York failed to train,

supervise, discipline, or otherwise control NYPD officers, which constitutes deliberate

indifference to the rights of protesters, including Plaintiff Shafa.

40.     Defendant City of New York's policy, custom, or usage of using excessive,

unjustified, and unreasonable force when policing protests was the moving force behind Plaintiff

Shafa's injuries.

Case 1:21-cv-04809-MKB-PK Document 1-1 Filed 08/26/21 Page 17 of 23 PageID #: 20

41.     As a direct and proximate result of Defendants' policies and unlawful conduct, Plaintiff Shafa suffered serious bodily injury, emotional distress and mental anguish, costs, and expenses, and was otherwise damaged and injured.

42.     Defendants John Does #1's conduct was willful, wanton, and reckless, and of such a nature that punitive damages should be imposed against him.

### Claim II: Unlawful Seizure and False Arrest

*Against Defendants City of New York and John Does #1-3*

*Fourth Amendment, 42 U.S.C. § 1983*

43.     Plaintiff realleges the preceding paragraphs as if set forth here.

44.     Defendants John Does #1-3, acting under color of state law, seized, detained, and arrested Plaintiff Shafa, restricting her freedom of movement, without privilege or lawful justification.

45.     Defendants could not reasonably believe that they had lawful cause to seize, detain, or arrest Plaintiff Shafa.

46.     Plaintiff Shafa was conscious of her confinement by Defendants.

47.     Plaintiff Shafa did not consent to confinement by Defendants.

48.     Thus, Defendants did not have suspicion or cause to seize, detain, or arrest Plaintiff Shafa.

49.     NYPD's practice and custom of unlawfully seizing, detaining, and arresting individuals at protests has and continues to be so persistent and widespread that it practically has

Case 1:21-cv-04809-MKB-PK   Document 1-1   Filed 08/26/21   Page 18 of 23 PageID #: 21

the force of law, constituting a policy of Defendant City of New York. Moreover, despite being aware of the NYPD's use of unlawful seizures, detentions, and arrests at protests, Defendant City of New York failed to train, supervise, discipline, or otherwise control NYPD officers, which constitutes deliberate indifference to the rights of protesters, including Plaintiff Shafa.

50.     Defendant City of New York's policy, custom, or usage of unlawfully seizing, detaining, and arresting individuals at protests was the moving force behind Plaintiff Shafa's injuries.

51.     As a direct and proximate result of Defendants' policies and conduct, Plaintiff Shafa was deprived of liberty, suffered serious bodily injury, emotional distress and mental anguish, costs, and expenses, and was otherwise damaged and injured.

52.     Defendants John Does #1-3's conduct was willful, wanton, and reckless, and of such a nature that punitive damages should be imposed against them.

### Claim III: False Arrest and Imprisonment

*Against Defendants City of New York and John Does #1-3*
*New York State Constitution, Article I, § 12 and New York State Law*

53.     Plaintiff realleges the preceding paragraphs as if set forth here.

54.     Defendants John Does #1-3, who were acting within the scope of their employment with Defendant City of New York, seized, detained, and arrested Plaintiff Shafa, restricting her freedom of movement, without privilege or lawful justification.

55.     Defendants could not reasonably believe that they had lawful cause to seize, detain, or arrest Plaintiff Shafa.

56.     Thus, Defendants did not have reasonable articulable suspicion or individualized probable cause to seize, detain, or arrest Plaintiff Shafa.

57.     Plaintiff Shafa was conscious of her confinement by Defendants.

58.     Plaintiff Shafa did not consent to confinement by Defendants.

59.     As a direct and proximate result of Defendants' conduct, Plaintiff Shafa was deprived of liberty, suffered serious bodily injury, emotional distress and mental anguish, costs, and expenses, and was otherwise damaged and injured.

60.     Defendants committed these tortious acts within the scope of their employment, and therefore Defendant City of New York, as their employer, is responsible for their tortious conduct under the doctrine of respondeat superior.

### Claim IV: Assault and Battery

*Against Defendants City of New York and John Doe #1*

*New York State Law*

61.     Plaintiff realleges the preceding paragraphs as if set forth here.

62.     Defendant John Does #1, who was acting within the scope of his employment with Defendant City of New York, knowingly, intentionally, and willfully committed assault and battery against Plaintiff Shafa.

63.     Defendant John Doe #1 knowingly, intentionally, and willfully placed Plaintiff Shafa in apprehension of imminent harm and offensive bodily contact.

64.     Defendant John Doe #1 knowingly, intentionally, and willfully made an offensive contact against Plaintiff Shafa without privilege or consent.

65.     Defendant John Doe #1's assault and battery of Plaintiff Shafa was without cause or justification and was not the result of a lawful arrest.

66.     Plaintiff Shafa did not consent to the offensive contact.

Case 1:21-cv-04809-MKB-PK   Document 1-1   Filed 08/26/21   Page 20 of 23 PageID #: 23

67.     As a result of Defendant John Doe #1's conduct, Plaintiff Shafa was placed in apprehension of imminent harm and offensive bodily contact and was subject to offensive bodily contact.

68.     As a direct and proximate result of Defendant John Doe #1's conduct, Plaintiff Shafa suffered serious bodily injury, emotional distress and mental anguish, costs, and expenses, and was otherwise damaged and injured.

69.     Defendant John Doe #1 committed these tortious acts within the scope of their employment, and therefore Defendant City of New York, as their employer, is responsible for their tortious conduct under the doctrine of respondeat superior.

### Claim V: Negligent and Intentional Infliction of Emotional Distress

*Against Defendants City of New York and John Does #1-3*

*New York State Law*

70.     Plaintiff realleges the preceding paragraphs as if set forth here.

71.     Defendants John Does #1-3, who were acting within the scope of their employment with Defendant City of New York, intentionally and without justification assaulted, battered, detained, and arrested Plaintiff Shafa. Defendants acted recklessly and with utter disregard for the consequences of their actions, which caused severe emotional distress to Plaintiff Shafa.

72.     Defendants' actions exceeded all reasonable bounds of decency, were outrageous and shocking, and resulted in severe emotional distress, and other injuries, to Plaintiff Shafa.

73.     Defendants committed these tortious acts within the scope of their employment, and therefore Defendant City of New York, as their employer, is responsible for their tortious conduct under the doctrine of respondeat superior.

Case 1:21-cv-04809-MKB-PK Document 1-1 Filed 08/26/21 Page 21 of 23 PageID #: 24

**Claim VI: Negligence**

*Against Defendants City of New York and John and Jane Does #1-50*

*New York State Law*

74.     Plaintiff realleges the preceding paragraphs as if set forth here.

75.     Defendants John and Jane Does #1-50 owed a special duty of care to Plaintiff Shafa, whom they injured and/or witnessed being injured by other NYPD Officers. Defendants violated this special duty by failing to intervene to prevent injury, and by failing to seek and/or provide medical aid.

76.     NYPD Officers' negligent failure to intervene and seek and/or provide medical aid to Plaintiff Shafa caused her further injury.

77.     Defendants committed these tortious acts within the scope of their employment, and therefore Defendant City of New York, as their employer, is responsible for their tortious conduct under the doctrine of respondeat superior.

**Claim VII: Negligent Supervision, Retention, and Training**

*Against Defendant City of New York*

*New York State Law*

78.     Plaintiff realleges the preceding paragraphs as if set forth here.

79.     Defendant City of New York failed to use reasonable care in the training and supervision of the NYPD Officers who assaulted, battered, falsely imprisoned, negligently injured, and violated the constitutional rights of Plaintiff Shafa.

Case 1:21-cv-04809-MKB-PK   Document 1-1   Filed 08/26/21   Page 22 of 23 PageID #: 25

80.     As a direct and proximate result of Defendant's negligence, Plaintiff Shafa suffered serious bodily injury, emotional distress and mental anguish, costs, and expenses, and was otherwise damaged and injured.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand the following relief against Defendants:

a. Compensatory damages in an amount to be determined at trial;

b. Punitive damages against all Defendants except the City of New York in an amount to be determined at trial;

c. Reasonable costs and attorneys' fees under 42 U.S.C. § 1988;

d. Pre- and post-judgment interest to the fullest extent permitted by law; and

e. Any additional relief the Court deems just and proper.

DATED: this 12th Day of August 2021             New York, New York

_____/s/_____
By: Akeeb Dami Animashuan
Attorneys for Plaintiffs
14 Wall St., Ste 1603
New York, NY 10005

LORD LAW GROUP PLLC

_____/s/_____
By: Masai I. Lord, Esq
Attorney for Plaintiff
14 Wall St., Ste 1603
New York, NY 10005

Case 1:21-cv-04809-MKB-PK   Document 1-1   Filed 08/26/21   Page 23 of 23 PageID #: 26

## ATTORNEY'S VERIFICATION

MASAI I. LORD, an attorney duly admitted to practice before the Courts of the State of New York, affirms the following to be true under the penalties of perjury:

I am an attorney at LORD LAW GROUP PLLC, attorneys of record for Plaintiff TARA SHAFA. I have read the annexed SUMMONS and COMPLAINT and know the contents thereof, and the same are true to my knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters I believe them to be true. My belief, as to those matters therein not stated upon knowledge, is based upon facts, records, and other pertinent information contained in my files.

This verification is made by me because Plaintiff are not presently in the county wherein I maintain my offices.


DATED:      New York, New York
            August 13, 2021


_____
MASAI I. LORD
Counsel for Plaintiff